## LATTA BROS. ENGINEERING & REFRIGERATION CO. v. BROMFIELD MFG. CO., Inc.

## LATTA BROS. ENGINEERING & REFRIGERATION CO. v. THE OCEANLIFE.

Civ. No. 51–272.

Adm. No. 51–65.

United States District Court
D. Massachusetts.

June 12, 1952.

Arthur J. Santry of Putnam, Bell, Dutch & Santry, Boston, Mass., for plaintiff.

Charles S. Bolster of Bingham, Dana & Gould, Boston, Mass., for Trawler Cormorant, Inc.

Francis T. Leahy, Boston, Mass., for Bromfield Mfg. Co.

SWEENEY, Chief Judge.

These two actions, one at law and the other in admiralty, grow out of the purchase and sale of a refrigeration machine

which was installed aboard the M/V "Oceanlife". It was installed as a result of a written contract and the cost price was $11,230. After application of certain credits and interim payments, plaintiff alleges that there is still a balance due of $3,801.75. In the law action he seeks recovery of this amount from the Bromfield Manufacturing Co., Inc. In the admiralty action he seeks a lien against the M/V "Oceanlife" which is owned by Trawler Cormorant, Inc.

### Findings of Fact.

Isadore Bromfield was the principal stockholder, president and treasurer, and managing officer of the corporation Trawler Cormorant, Inc. He held the same positions and interests in Bromfield Manufacturing Co. In short, he ran both corporations. In his dealings with the plaintiff Bromfield referred to the M/V "Oceanlife" as his vessel, although he owned the controlling stock in Trawler Cormorant, Inc., the registered owner. In fact, when the admiralty action was filed the libellant was under the impression that the M/V "Oceanlife" was then owned by the Bromfield Manufacturing Co.

On January 11, 1950 Bromfield was about to engage in an enterprise to be known as factory fishing. It was his plan to install, in addition to the usual fishermen, a crew of filleters who would process the fish into fillets as soon as they were caught and the fillets thereafter would be quickly frozen by a refrigeration machine, so that instead of short trips of 8 to 10 days each the M/V "Oceanlife" would stay out on the banks for periods as long as a month, filling her holds with fish while the fish already caught would be saved from deterioration through the freezing process. This method of fishing had been tried in foreign countries with some success, and had been tried off the Pacific Coast with what success we do not know, but on the Atlantic seaboard it was new. It was watched with a great deal of interest and many people predicted that it would not be a workable scheme because American labor would not react favorably and would not be subjected to the perils and loneliness of staying at sea for 30 days. This proved to be true.

In December of 1949 a representative of the plaintiff got in touch with Bromfield and explained to him that his concern was in business in Seattle, Washington where they manufactured freezing equipment, and particularly for ocean-going vessels. He attempted to sell his freezing device to Bromfield, but Bromfield would not enter into a contract until he had the opportunity to study the machine. Shortly thereafter Bromfield sent his son, an engineer graduate of M. I. T., out to the west coast and the plaintiff's representative took him aboard at least one vessel for the purpose of seeing and inspecting the freezer unit. On January 11, 1950 the plaintiff entered into a written contract with the Bromfield Manufacturing Co. for the sale of a marine absorption refrigeration machine to be installed in the M/V "Oceanlife". The cost price was $11,230 and I find that the balance of the purchase price remaining unpaid is $3,801.75. All of the correspondence with the plaintiff was on the stationery of the Bromfield Manufacturing Co. The method of payment provided in the contract was 20% with the purchase order, which was sent with the Bromfield Manufacturing Co. letter of January 11, 20% upon receipt of shipping documents, 20% upon arrival in Boston, and 40% upon completion of a test run under contract conditions. After the machine had been received and installed the plaintiff's engineers, in accordance with the terms of the contract, made a trial run of the M/V "Oceanlife", and being unable to catch the fish at sea put into Portland, Maine where they purchased fish and processed it aboard the boat. At the time of this processing Bromfield was present. After this processing had been completed at Portland, Bromfield with the agent of the plaintiff returned to Boston, and Bromfield expressed himself, after consulting with the engineers, as satisfied and told the agent of the plaintiff that he should return to Seattle and that his check would be forthcoming immediately. The check has never arrived.

The plaintiff's engineers had requested the Bromfield Manufacturing Co. to install the piping in such a way as to be immediately under the floor deck which

474

would provide gravity flow back to the generator. For some reason of its own Bromfield Manufacturing Co. set this return pipe in such a way as made it necessary for a pump to be installed to make the proper return, and this pump was a source of much trouble later. I do not find that there were any express warranties in the contract, but on the contrary that both parties were engaged in a novel enterprise where the risks were uncalculated, and that the plaintiff furnished just exactly what he contracted to furnish to the defendant.

■ In the admiralty action, the libellee maintains that the libellant waived his lien against the M/V "Oceanlife" when he entered into a contract with Bromfield Manufacturing Co. and still further waived it when he brought suit at law against the Bromfield Manufacturing Co. As previously found, there was a lot of loose talk between the libellant's representative and Bromfield under which the libellant got the impression that Bromfield through the Bromfield Manufacturing Co. was the owner of the M/V "Oceanlife". Under these circumstances they could not have been deemed to have waived their lien. It is quite true that when one party with full knowledge elects to take a security from the owner or purchaser he may be deemed to have waived his lien, but under the circumstances in this case where the libellant, whether misinformed or misunderstanding, got the impression that the true owner was the person he was dealing with, then certainly he was looking to the true owner as well as the vessel for the payment of the purchase price of the goods supplied.

Conclusions of Law (Law Action).

■ From the foregoing I conclude and rule in the law action that the Bromfield Manufacturing Co., Inc. is indebted to the plaintiff in the sum of $3,801.75, being the balance of the purchase price on the contract.

Conclusions of Law (Admiralty Action).

From the foregoing I conclude and rule that the libellant has a good lien under Title 46 U.S.C.A. § 971 et seq. for the unpaid balance of the purchase price.

■ The libellant and plaintiff cannot recover from both Bromfield Manufacturing Co. and the vessel, but it is entitled to judgment against Bromfield Manufacturing Co. and a decree in its favor against the vessel. A proper order and decree may be prepared and submitted.